# United States Court of Appeals
## For the First Circuit

Nos. 15-1356
    15-1722

MYRNA COLÓN-MARRERO; JOSEFINA ROMAGUERA AGRAIT,

Plaintiffs, Appellees; Cross-Appellants,

GUILLERMO SAN ANTONIO-ACHA, as Electoral Commissioner of the
Popular Democratic Party; JORGE DÁVILA, as Electoral
Commissioner of the New Progressive Party,

Defendants, Appellees

v.

LIZA M. GARCÍA VÉLEZ, as President of the Puerto Rico State
Elections Commission,

Defendant, Appellant; Cross-Appellee,

ROBERTO I. APONTE-BERRÍOS, as Electoral Commissioner of the
Puerto Rico Independence Party; JULIO FONTANET MALDONADO, as
Electoral Commissioner of the Movimiento Union Soberanista;
ADRIÁN DÍAZ-DÍAZ, as Electoral Commissioner of the
Puertoriqueños por Puerto Rico; LILLIAN APONTE-DONES, as
Electoral Commissioner of the Partido del Pueblo Trabajador,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

José L. Nieto-Mingo, with whom Nieto Law Offices were on brief, for defendant-appellant/cross-appellee García Vélez.

Jorge Martínez-Luciano, with whom Martínez-Luciano & Rodríguez-Escudero was on brief, for defendant-appellee San Antonio-Acha.

Joan Schlump Peters, with whom Andrés Guillemard-Noble and Nachman & Guillemard, P.S.C. were on brief, for defendant-appellee Dávila.

Carlos A. Del Valle Cruz, with whom Del Valle Law, Carlos M. Hernández López, and Rafael E. García Rodón were on brief, for plaintiffs-appellees/cross-appellants.

February 1, 2016

**LIPEZ**, **Circuit Judge**.  We revisit in this case whether federal law forbids Puerto Rico from removing individuals from its active voter registry for the office of Resident Commissioner -- the only federal elective position in Puerto Rico -- based solely on their failure to vote in one general election.  In 2012, in an interlocutory appeal brought just weeks before Election Day, the panel majority held that the National Voter Registration Act ("NVRA") does not apply to Puerto Rico and thus does not supersede the Commonwealth's voter deactivation procedures.  See Colón-Marrero v. Conty-Pérez, 703 F.3d 134, 137 (1st Cir. 2012) (per curiam).  The majority also concluded, however, that plaintiffs were likely to succeed on the merits of their claim that another federal statute -- the Help America Vote Act ("HAVA") -- does bar Puerto Rico from removing voters from the registry for the office of Resident Commissioner unless they fail to participate in the preceding two general federal elections.  Id. at 138.  We nonetheless refused to order plaintiffs' immediate reinstatement to the voter registry, deeming such preliminary injunctive relief "improvident" given the uncertain feasibility of properly reinstating voters in the short time remaining before the election.  Id. at 139.

On remand for consideration of the merits of plaintiffs' claims after the 2012 election, the district court agreed with our preliminary assessment that HAVA invalidates Article 6.012 of

- 3 -

Puerto Rico Act No. 78 of 2011 insofar as it applies to voter eligibility for federal elections. It thus issued injunctive and declaratory relief barring the Puerto Rico State Elections Commission ("SEC") from removing otherwise eligible voters from the active election registry unless HAVA's requirements are met. Defendant Liza M. García Vélez, as SEC president, now challenges that ruling.[1] In a cross-appeal, plaintiffs ask us to reconsider our conclusion that NVRA does not apply to Puerto Rico, and they further argue that excluding the Commonwealth from NVRA's coverage would violate the Equal Protection Clause of the Constitution.

Having considered each of these claims, we reiterate our conclusion that NVRA does not apply to Puerto Rico. In addition, we reject plaintiffs' constitutional challenge to that statute's coverage. We also adhere to our preliminary view that HAVA, which comprehensively addresses federal election administration, invalidates Article 6.012's deactivation procedure. We further

---

[1] Over time, new defendants have been substituted for their predecessors upon their appointment as president of the SEC or electoral commissioner. García Vélez, for example, succeeded Ángel González Román, who previously had succeeded Héctor Conty-Pérez as SEC president and, as a result of that role, as a defendant in this case. In addition, certain electoral-commissioner defendants representing particular political parties, who originally opposed plaintiffs' request for relief, are either not part of this appeal or have adopted the plaintiffs' position and join them as appellees. Currently, García Vélez is the sole defendant-appellant.

hold that plaintiffs may bring a private cause of action seeking relief under HAVA pursuant to 42 U.S.C. § 1983.  Accordingly, we affirm the judgment of the district court.

## I. Factual Background

### A. The 2012 Litigation

Plaintiffs Myrna Colón-Marrero and Josefina Romaguera Agrait filed this action in September 2012 claiming they were unlawfully removed from the Commonwealth's active voter registry, pursuant to Article 6.012,[2] for having "exercised their right not to vote in the 2008 election for Resident Commissioner."[3]  Am. Compl. ¶ 1.  They asserted violations of NVRA, HAVA, and the Constitution, and sought declaratory and injunctive relief that included invalidation of Article 6.012 and immediate reinstatement of themselves and all similarly situated persons as eligible voters

---

[2] In pertinent part, Article 6.012, P.R. Laws Ann. tit. 16, § 4072 (2011), provides:

> If a voter fails to exercise his/her right to vote in a general election, his/her file in the General Voter Registry shall be inactivated.  The Commission may exclude voters from the General Voter Registry on the grounds provided by this subtitle or established through regulations.  The exclusion of a voter shall not entail the elimination of his/her information from the General Voter Registry.

[3]  The only federal office for which Puerto Rico residents are eligible to vote is Resident Commissioner -- a position that exists only in Puerto Rico.  See 48 U.S.C. § 891; 52 U.S.C. § 30101(3).

"in the upcoming election for federal office." Id. ¶ 2.[4] Under both NVRA and HAVA, registered voters retain eligibility to vote in a federal election unless they have failed to respond to a notice seeking to confirm eligible residency and have not voted in two consecutive general elections for federal office. See 52 U.S.C. § 20507(b)(2)(NVRA); id. § 21083(a)(4)(A) (HAVA).[5] Plaintiffs also asked for an order directing the defendants "to abide by all the voter registration and other applicable mandates of the NVRA, HAVA and the first, due process and equal protection amendments to the Constitution." Am. Compl. ¶ 2.

The district court denied plaintiffs' request for a preliminary injunction, and Colón-Marrero (but not Romaguera Agrait) appealed. After holding a special oral argument session on October 11, 2012, a panel of this court concluded that Colón-Marrero had shown a likelihood of success on the merits of her claim for reinstatement. See Colón-Marrero, 703 F.3d at 136. We

---

[4] Plaintiffs estimated in their complaint that approximately 500,000 otherwise qualified voters were deactivated for the 2012 election "simply because they did not vote in the 2008 general elections." Am. Compl. ¶ 17. More than 200,000 of those voters used the designated reactivation procedure to qualify to vote in 2012. See Colón-Marrero, 703 F.3d at 136, 139; P.R. Laws Ann. tit. 16, § 4073. The deactivated voters are known as "I-8 voters."

[5] Statutory provisions relating to voting and elections, including NVRA and HAVA, recently were transferred from Titles 2 and 42 into new Title 52, which is labeled "Voting and Elections." See 52 U.S.C. Disposition Table. Other than in quoting sources that use the old code references, we refer to the new Title 52 section numbers.

- 6 -

determined, however, that "serious factual questions remained as to the balance of harms and the public interest in ordering the immediate reinstatement of the more than 300,000 voters who had been stricken from the registration roll." Id. Accordingly, we remanded the case to the district court for fact-finding on the feasibility of reactivating the affected voters in time for the November 6 election. See id.

Based on testimony presented at a two-day hearing on October 15 and 16, the district court found it would be feasible to reactivate the I-8 voters if this court ordered such relief by October 23 and devised a same-day recusal procedure that would allow the Commonwealth to exclude voters who had become ineligible for reasons other than Article 6.012 (such as moving out of the precinct or the Commonwealth). Id. at 136-37. The district court certified its findings to this court on October 17. In a brief order the next day, the appellate panel, with one dissenting member, affirmed the denial of preliminary relief because the district court's findings did not alleviate the majority's feasibility concerns.

Opinions explaining the October 18 ruling were issued on November 2. Among other factors, the majority noted that Puerto Rico law does not include a mechanism for same-day challenges to voter eligibility, which the district court had identified as necessary, and the majority observed that, "[e]ven if it were

appropriate for a federal court to prescribe alternative recusal procedures, we would be ill equipped to do so in the short time remaining before the election." Id. at 139. The majority also pointed out that, although plaintiff originally sought to vote only for the federal position of Resident Commissioner -- rather than seeking to vote generally in the election[6] -- she had elicited "scant evidence" at the evidentiary hearing on the practicality of a limited reinstatement. Id. at 138. As a result, the district court had made no finding on that issue -- "a major concern for the majority because the candidates for both Resident Commissioner and Governor appear on the same ballot." Id. at 138-39. Moreover, the panel expressed concern about the plaintiffs' decision to bring this action "less than two months before a general election that had long been scheduled for November 6." Id. at 139.

Having determined that, in these circumstances, it would be "improvident to grant plaintiff's requested relief with only eighteen days remaining before the general election," id., the panel refused to grant a preliminary injunction and remanded the case to the district court for further proceedings.[7]

---

[6] Colón-Marrero raised the broader question of a right to vote on local candidates and issues to the appeals court for the first time in her supplemental briefing after the district court's fact-finding. 703 F.3d at 138.

[7] The dissent argued, inter alia, that Puerto Rico is covered by both NVRA and HAVA, and that the requested preliminary injunction should have been granted.

**B. Proceedings on Remand**

In June 2013, on remand, the parties agreed to submit the case to the district court for decision on the merits based on a joint stipulation of facts and memoranda of law. On March 31, 2014, the district court ordered the parties to file the stipulation by April 30 and simultaneous memoranda by May 30, with replies due by June 20. The court described the case at that point as follows:

> Although the nature of the controversies has been well defined during the preliminary injunction relief stage, primarily during the remand hearing and in the First Circuit's opinion issued in Colón-Marrero v. Conty-Pérez, 703 F.3d 134 (1st Cir. 2012), the parties are advised that the scope of relief -- whether the remedy is limited to the election of the Resident Commissioner in Puerto Rico or extends to the general election process -- is an open question that shall be addressed in the parties' briefs.

In compliance with the order, the parties filed a limited stipulation of facts stating only that (1) the two plaintiffs voted in the 2004 general election, (2) did not vote in the 2008 general election, (3) did not follow the reactivation requirement of Article 6.012 to re-establish eligibility to vote in 2012, and (4) did not vote in the 2012 general election. In their memoranda, the last of which was filed on June 20, 2014, the parties presented arguments on plaintiffs' HAVA and constitutional claims -- with

all parties agreeing that our 2012 ruling governed on the applicability of NVRA.

The district court found in favor of plaintiffs on January 30, 2015, and entered final judgment granting declaratory and injunctive relief on June 4, 2015.[8] In its decision, the court cited the undisputed fact that HAVA by its terms applies in Puerto Rico, see 52 U.S.C. § 21141, and it concluded that the HAVA provision setting out the two-election prerequisite for deactivating voters is not limited to jurisdictions covered by NVRA. The court explained that the pertinent provision in HAVA does not merely incorporate the equivalent NVRA provision, but "explicitly set[s] forth" the requirement that a voter miss two consecutive general elections before being deactivated.

The court thus held that the one-election deactivation standard of Article 6.012 must give way to HAVA's two-election requirement. It further concluded that, because "Puerto Rico has a single voter registration system, not two," HAVA "necessarily regulates the registration lists for the general elections in Puerto Rico, which always include the election for the Resident

---

[8] In its June 4 order, the court granted final judgment on plaintiffs' claim under HAVA and explained that, given the relief ordered pursuant to that claim, it was unnecessary to reach plaintiffs' NVRA and constitutional claims. That same day, the court also reissued the decision that it had issued in January under the title "Declaratory Judgment" with a new title: "Memorandum Opinion Declaring Rights and Granting Equitable Relief."

Commissioner as an integral part of the general election process." The court permanently enjoined the SEC "from removing from the official list of eligible voters any registrant who did not vote in a single general election" and declared that "the SEC is affirmatively ordered that no lawfully registered voter may be removed from the official list of eligible voters unless they have not voted in the two immediately preceding elections and have received and have been given notice of an intent to remove them from such list."

These appeals followed. Defendant García Vélez challenges the grant of declaratory and injunctive relief for plaintiffs based on HAVA. In their cross-appeal, plaintiffs argue that this court should reconsider its ruling that NVRA does not apply to Puerto Rico, emphasizing that "said determination was solely a preliminary injunction review as to probable outcomes." Alternatively, plaintiffs seek a ruling that excluding Puerto Rico from NVRA violates the Equal Protection Clause of the United States Constitution.[9]

---

[9] Because plaintiffs sought an order requiring the defendants to abide by all of NVRA's requirements -- including expanded methods of voter registration -- invalidation of Article 6.012's deactivation procedure based on HAVA does not render their other claims moot.

- 11 -

## II. The Cross-Appeal: Applicability of NVRA

### A. Statutory Construction

We decline to revisit our prior decision that NVRA does not apply to Puerto Rico. Although plaintiffs are correct that we reached that decision in the context of a request for preliminary relief, our examination of the statute was neither tentative nor incomplete. We concluded that "[t]he textual signals and the legislative history, taken together, constitute persuasive evidence that Congress did not intend to include Puerto Rico as a 'State' under the NVRA." Colón-Marrero, 703 F.3d at 138.[10] Indeed, the district court and parties have treated our analysis as decisive, and plaintiffs essentially admit in their brief that they reiterate their NVRA statutory construction argument out of an abundance of caution. To eliminate any ambiguity, we now explicitly reaffirm our earlier determination that NVRA does not apply to Puerto Rico for the reasons outlined in our November 2012 opinion. See Colón-Marrero, 703 F.3d at 137-38.

### B. The Constitutionality of NVRA

We also find unavailing plaintiffs' theory that they are entitled to the protections provided by NVRA because excluding Puerto Rico from the statute's coverage violates the Equal Protection Clause. Plaintiffs assert that, absent NVRA's

---

[10] NVRA defines "State" as "a State of the United States and the District of Columbia." 52 U.S.C. § 20502(4).

protections, citizens residing in Puerto Rico have a version of the right to vote that is unconstitutionally inferior to the right afforded citizens residing in the fifty states and the District of Columbia.

Plaintiffs first suggest that Congress's decision not to apply NVRA to Puerto Rico must be examined under strict scrutiny. They rely on the fact that a legislative classification is subject to strict scrutiny if it "impermissibly interferes with the exercise of a fundamental right," Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976), and that the right to vote "is of the most fundamental significance under our constitutional structure," Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979). But a necessary prerequisite to strict scrutiny is a showing that a fundamental right has been burdened, see Romer v. Evans, 517 U.S. 620, 631 (1996), and the plaintiffs have failed at the threshold to demonstrate how NVRA's exclusion of Puerto Rico burdens their right to vote. The mere fact that a statute concerns voting does not establish that the statute infringes on a fundamental right. See Igartua de la Rosa v. United States, 32 F.3d 8, 10 & n.2 (1st Cir. 1994) (per curiam). Absent a showing that NVRA substantially burdens the rights of Puerto Rico residents to vote in federal elections -- and no such showing has even been attempted here -- strict scrutiny does not apply.

- 13 -

In the absence of strict scrutiny, plaintiffs' equal protection challenge prompts rational basis review. See Romer, 517 U.S. at 631. Plaintiffs' claim founders on this standard. To be sure, NVRA prescribes more restrictive deactivation prerequisites than does Article 6.012 and, in that respect, arguably offers greater protection to the federal voting rights of mainland citizens. Yet, significant factual differences exist between federal elections in Puerto Rico and in the jurisdictions covered by NVRA. Unlike in the states and the District of Columbia, general federal elections in Puerto Rico occur on a four-year, rather than two-year, cycle. See 48 U.S.C. § 891 (setting a four-year term for the Resident Commissioner). Article 6.012 thus allows election officials to remove individuals from active voting rolls after the same four-year period prescribed by NVRA -- albeit after one election rather than two.

In addition, the only federal election in Puerto Rico is for the office of Resident Commissioner, a non-voting position in Congress. Unlike the District of Columbia, Puerto Rico does not choose Presidential electors. See U.S. Const. art. II, § 1, cl.2; id. amend. XXIII. Plaintiffs do not explain why Congress could not rely on those distinctions to refrain from extending NVRA's obligations to the federal election process in the Commonwealth.[11]

_____

[11] We note, however, that Congress via HAVA later imposed the same prerequisites for removing Puerto Rico residents from the

- 14 -

We thus conclude that plaintiffs have not articulated a viable constitutional challenge to NVRA based on the exclusion of Puerto Rico from its scope.

### III. The Appeal: HAVA and a Private Right of Action

At the heart of this appeal is the district court's grant of declaratory and injunctive relief for plaintiffs based on its determination that HAVA's two-election deactivation threshold supersedes the single-election trigger of Article 6.012.[12] Appellant García Vélez, as SEC president, challenges those remedies on two separate grounds. She first argues that the pertinent provision of HAVA -- like the equivalent section of NVRA -- does not apply to Puerto Rico elections. Second, she insists that, even if Puerto Rico is within the provision's scope, there is no private right of action to seek a remedy.

---

registry of eligible voters for federal elections. See infra Section III.A.

[12] In its Memorandum Opinion, the district court noted that Puerto Rico has a combined voter registration system for federal and Commonwealth elections and, hence, it concluded that "the provision set forth in HAVA necessarily regulates the registration lists for the general elections in Puerto Rico, which always include the election for the Resident Commissioner as an integral part of the general election process." We, however, offer no view as to whether the SEC is able to comply with HAVA without also changing its requirements for eligibility to vote for Commonwealth offices. See Colón-Marrero, 703 F.3d at 138 ("[I]t is an open and difficult question -- one not addressed by plaintiff -- whether HAVA would provide a basis for a federal court ordering the reinstatement of voters in Commonwealth elections.").

We consider each of these issues of law in turn. Our review is de novo. See Gen. Motors Corp. v. Darling's, 444 F.3d 98, 107 (1st Cir. 2006).

## A. Does HAVA section 303(a)(4) Supersede Article 6.012's Deactivation Procedure?

The November 2000 presidential election "and its attendant controversies" prompted Congress "to review and reform the administration of federal elections." Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1155 (11th Cir. 2008); see also H.R. 107-329, pt. 1, at 31 (2001), 2001 WL 1579545, at *31 ("The circumstances surrounding the election that took place in November 2000 brought an increased focus on the process of election administration, and highlighted the need for improvements."); Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, The Law of Democracy 1169 (4th ed. 2012). HAVA was the product of that review, and the statute, inter alia, revisited the subject of voter registration that also had been the primary focus of NVRA. See 52 U.S.C. § 20501(b) (stating that the purposes of NVRA include "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "ensur[ing] that accurate and current voter registration rolls are maintained"); 52 U.S.C. §§ 21081-85 (outlining HAVA requirements for election technology and

administration).[13]  Unlike NVRA, however, HAVA by its express terms applies to Puerto Rico and the United States territories, in addition to the states and the District of Columbia.  Id. § 21141.

The specific HAVA provision at issue in this case, section 303(a), is titled "Computerized statewide voter registration list requirements."  52 U.S.C. § 21083(a).  With an exception not relevant here, the section directs that "each State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State."   Id. § 21083(a)(1)(A).   Appellant focuses on HAVA

---

[13] Although the two statutes share a purpose to "protect the integrity of the electoral process," 52 U.S.C. § 20501(b)(3); see also H.R. Rep. 107-329, pt. 1, at 31 (2001), 2001 WL 1579545, at *31 (stating that HAVA's purpose is "to improve our country's election system"), NVRA's primary emphasis is on simplifying the methods for registering to vote in federal elections, see Young v. Fordice, 520 U.S. 273, 275 (1997), while HAVA's voter registration provisions are focused on achieving greater accuracy by improving technology and administration, see 52 U.S.C. § 21083.

NVRA, for example, "requires each State to permit prospective voters to 'register to vote in elections for Federal office' by any of three methods: simultaneously with a driver's license application, in person, or by mail."  Arizona v. Inter Tribal Council of Ariz., Inc., 133 S. Ct. 2247, 2251 (2013) (quoting 52 U.S.C. § 20503(a)).  HAVA's requirements include creation of a "[c]omputerized statewide voter registration list" to "ensure that voter registration records in the State are accurate and are updated regularly."  52 U.S.C. § 21083(a), (a)(4).

section 303(a)(4), which is titled "Minimum standard for accuracy of State voter registration records" and provides:

> The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following:
>
> (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, **consistent with the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.)**, registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.
>
> (B) Safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters.

52 U.S.C. § 21083(a)(4) (emphasis added).

Based on the highlighted language above, appellant argues that this subsection of HAVA applies only to those jurisdictions governed by NVRA. Her contention is that the HAVA requirement would not be "consistent with" NVRA if it is applied beyond the scope of that statute given that Congress excluded Puerto Rico from essentially the same deactivation requirement under NVRA -- i.e., by limiting NVRA's coverage to the states and the District

- 18 -

of Columbia.[14]   The district court concluded otherwise, pointing out that HAVA does not simply invoke NVRA, "leaving it to the

---

[14] NVRA references the deactivation prerequisites in two different, but related, provisions.  The statute requires states to "conduct a general program that makes a reasonable effort" to remove the names of no-longer-eligible voters from the active voter registry on account of their death or a change in residence.  52 U.S.C. § 20507(a)(4).  Requirements for such a program, including the notice and failure-to-vote limitations, are spelled out in the following subsection, titled "Confirmation of voter registration":

> Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office--
> (1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965; and
> (2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual--
> (A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then
> (B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

52 U.S.C. § 20507(b) (citation omitted).

The "procedures described in subsections (c) and (d)" include the second reference to the deactivation prerequisites.  In combination, those two subsections authorize use of Postal Service information to identify registrants whose addresses may have changed, but bar removal of names from the list of eligible voters

- 19 -

reader to refer to that law to determine its contents," but instead explicitly sets forth the two-election requirement for deactivation of voters.

Our starting point in discerning the meaning of a statute is the provision itself, and "[t]he plain meaning of a statute's text must be given effect 'unless it would produce an absurd result or one manifestly at odds with the statute's intended effect.'" Arnold v. United Parcel Serv., Inc., 136 F.3d 854, 858 (1st Cir. 1998) (quoting Parisi ex rel. Cooney v. Chater, 69 F.3d 614, 617 (1st Cir. 1995)); see also Matamoros v. Starbucks Corp., 699 F.3d 129, 134 (1st Cir. 2012) ("We assume that the ordinary meaning of the statutory language expresses the legislature's intent, and we resort to extrinsic aids to statutory construction (such as legislative history) only when the wording of the statute is freighted with ambiguity or leads to an unreasonable result."). "Of course, we focus on 'the plain meaning of the whole statute, not of isolated sentences.'" Arnold, 136 F.3d at 858 (quoting Beecham v. United States, 511 U.S. 368, 372 (1994)).

---

on account of a change in residence absent written confirmation from the registrant or a failure both to respond to a notice and vote in two elections after the notice has been sent. Id. § 20507(c), (d).

**1. The Statute's Text**

The plain meaning of section 303(a)(4)(A) is apparent from both its structure and its wording. Most significantly, the provision's mandate is stated independently of the "consistent with" phrase that is the foundation of appellant's argument. The first sentence of the subsection explains that a "system of file maintenance" must be created "to remove registrants who are ineligible to vote from the official list of eligible voters," and the second sentence explains how "such system" must operate. 52 U.S.C. § 21083(a)(4)(A). These required actions are not defined by reference to obligations arising from NVRA.

Rather, in clear, affirmative language, the second sentence directs removal of registrants from "the official list of eligible voters" if they have not responded to a notice and did not vote in "2 consecutive general elections for Federal office." Id. The provision then emphasizes the need for both notice and a voting gap by stating that removal is barred "solely by reason of a failure to vote." Id. The reference to NVRA, by contrast, appears in a subordinate clause in that sentence. Its content and placement clearly signal a collateral purpose: to instruct responsible election officials and others (including the courts) that the measures required by HAVA do not alter NVRA's requirements and, hence, they should be implemented consistently with NVRA.

Appellant insists that examining section 303(a)(4)(A) in context undermines this textual analysis. She argues that, despite the explicit inclusion of Puerto Rico and the territories within HAVA's overall scope, Congress expressly exempted these jurisdictions from obligations that also appear in NVRA. We disagree.

## 2. The Statutory Context

As a prelude to our discussion of appellant's contextual argument, we pause briefly to note the detailed landscape of HAVA section 303. Section 303 governs two different categories of prescriptions, as reflected in its overall heading: "Computerized statewide voter registration list requirements and requirements for voters who register by mail." 52 U.S.C. § 21083. Subsection (a) addresses the statewide registration list, and subsection (b) addresses registration by mail. Each of those subsections is divided into five paragraphs, most of which are further subdivided into a number of subparagraphs. A contextual review thus requires close examination of multiple provisions. To aid the reader's understanding of our analysis, and as a supplement to the specific provisions within section 303 that are reproduced as part of our discussion, we provide the full text of section 303(a) and (b) in an appendix to this opinion.

Appellant claims that the inapplicability of HAVA's deactivation requirements to Puerto Rico is announced in

- 22 -

section 303(b)(5), which provides that "[n]othing in this subsection shall be construed to require a State that was not required to comply with a provision of the National Voter Registration Act of 1993 before October 29, 2002, to comply with such a provision after October 29, 2002."  52 U.S.C. § 21083(b)(5) (citation omitted).  Appellant's effort to prove her point through context, however, relies on taking this particular provision out of context.  As described above, subsection (a) of HAVA section 303 -- 52 U.S.C. § 21083 -- addresses the "Computerized statewide voter registration list requirements," while subsection (b) details "Requirements for voters who register by mail."

The language appellant invokes ("Nothing in this subsection . . . .") is the fifth, and final, paragraph of subsection (b) -- i.e., the subsection that addresses registration by mail.[15]  Given its placement, section 303(b)(5) can only reasonably be construed to refer to the requirements related to voting by mail.  Moreover, paragraph (5) by its terms merely states that HAVA is not changing the scope of NVRA, i.e., a state excluded from NVRA's requirements

---

[15] The five paragraphs under the heading "Requirements for voters who register by mail" are titled: (1) "In general"; (2) "Requirements"; (3) "Inapplicability"; (4) "Contents of mail-in registration form"; and (5) "Construction."  The "Construction" paragraph -- the one appellant cites -- contains only the language quoted above stating that "[n]othing in this subsection" should be construed to require a state's compliance with a provision of NVRA if it was not previously required to do so.  52 U.S.C. § 21083(b)(5) (emphasis added).

remains excluded from obligations imposed by NVRA. It says nothing about the state's additional obligations under HAVA.

However, two provisions within subsection (a) also invoke NVRA -- although neither proves helpful to appellant. Both provisions appear within the subsection's second paragraph, which is labeled "Computerized list maintenance," and, specifically, under subheading (A) of that paragraph, labeled "In general."[16] The introductory portion of section (a)(2)(A) directs state and local election officials to "perform list maintenance with respect to the computerized list on a regular basis," 52 U.S.C. § 21083(a)(2)(A), and it then specifies how to do so in terms that refer to NVRA.

One of those instructions states that, "[i]f an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993." See id. § 21083(a)(2)(A)(i). This instruction then lists several subsections of NVRA that prescribe removal procedures. Id. Among those provisions is one titled

---

[16] The five paragraphs of subsection (a) are titled as follows: (1) "Implementation"; (2) "Computerized list maintenance"; (3) "Technological security of computerized list"; (4) "Minimum standard for accuracy of State voter registration records"; and (5) "Verification of voter registration information." 52 U.S.C. § 21083(a). Subsection (a)(4) -- the "Minimum standard" provision -- includes the deactivation language.

"Removal of names from voting rolls," id. § 20507(d), which contains the notice and non-voting prerequisites for removal, linked to a change of residence. See id. § 20507(d)(1)(B); see supra n.14. Other provisions listed contain NVRA's requirements for (1) the content of the notice that must be sent to registrants, id. § 20507(d)(2); (2) "a general program" to remove the names of ineligible voters based on death or change in residence, id. § 20507(a)(4); and (3) procedures to allow a registrant who has moved within a district, without officially changing his address, to vote in his old or new polling place, id. § 20507(e).

This reliance on NVRA does not, however, describe a limitation of HAVA's coverage. Rather, by invoking these NVRA provisions, and directing that removal of voters under HAVA be done "in accordance with" NVRA, Congress is simply borrowing the earlier statute's procedures for effectuating the independent HAVA requirement to maintain an accurate list of eligible voters. It is telling that, while Congress piggybacks in section 303(a)(2)(A)(i) on NVRA's methodology, it affirmatively sets out the deactivation prerequisites in a separate provision -- section (a)(4)(A) reproduced above -- and labels those requirements as elements of the "[m]inimum standard for accuracy."[17]

---

[17] Appellant's failure to acknowledge HAVA's affirmative requirements leads her to rely incorrectly on an amicus brief

To similar effect is the other subparagraph within section 303(a)(2)(A) addressing the list maintenance requirements in relation to NVRA. Section (a)(2)(A)(iii) provides that, "if a State is described in section 4(b) of the National Voter Registration Act of 1993, that State shall remove the names of ineligible voters from the computerized list in accordance with State law." 52 U.S.C. § 21083(a)(2)(A)(iii) (citation omitted). States "described in section 4(b)" of NVRA are those that either have no registration requirements for voting in federal elections or allow "all voters in the State" to "register to vote at the polling place at the time of voting in a general election for Federal office." Id. § 20503(b). Puerto Rico would not be such a state even if it were included within NVRA's definition of "State." Indeed, this litigation would be unnecessary if that description applied to Puerto Rico.

Put simply, HAVA's look-back to NVRA in section 303(a)(4)(A) is sensibly understood only as an assurance that the obligations

_____

submitted in the prior appeal by the Civil Rights Division of the Department of Justice addressing NVRA's applicability to Puerto Rico. In particular, appellant emphasizes the brief's assertions that HAVA "does not expand the coverage of the NVRA" and that "HAVA does not add jurisdictions to the coverage of the NVRA." Rather than bolstering appellant's argument, those statements reinforce our conclusion that HAVA section 303(a) leaves NVRA intact while independently creating obligations for the jurisdictions it covers. Indeed, the DOJ brief recognizes that "HAVA imposes obligations of its own on covered jurisdictions -- including Puerto Rico."

and procedures required by that HAVA subsection -- i.e., a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters, but protects eligible voters -- align with those previously mandated by NVRA.[18]  By contrast, HAVA does not draw upon NVRA for the fundamentally different matter of which jurisdictions it covers.  Each statute has its own definition of a covered "State."  Under NVRA, "the term 'State' means a State of the United States and the District of Columbia."  52 U.S.C. § 20502(4).  Under HAVA, the term "State" "includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands."  Id. § 21141.

Nothing in the two sentences of section 303(a)(4)(A) -- or in the other provisions within subsection (a) discussed above -- suggests that, despite this explicit difference between the statutes' coverage, this HAVA provision applies only to jurisdictions subject to NVRA.  Indeed, it is inconceivable that Congress would have made HAVA applicable to these jurisdictions, but exempted them from this aspect of HAVA without saying so clearly.  The fact that the removal requirements in the two statutes overlap does not signify their irrelevance to Puerto Rico,

---

[18] HAVA also contains a generally applicable section stating that it has "No effect on other laws," including NVRA, other than as explicitly stated with respect to certain registration-by-mail requirements.  See 52 U.S.C. § 21145.

- 27 -

but rather underscores their perceived importance as part of any effort to improve the administration of elections.

Nor is it illogical to hold that HAVA requires Puerto Rico election officials to adopt voter registration procedures for the office of Resident Commissioner that we have concluded NVRA does not require of them. Different considerations, and experience over time, may have affected political judgments about the need for uniform national requirements in Puerto Rico even though citizens residing there elect only one federal official. Indeed, as described above, the November 2000 election "brought an increased focus on the process of election administration, and highlighted the need for improvements." H.R. Rep. 107-329, pt. 1, at 31, 2001 WL 1579545, at *31. In addition, the House Report on HAVA observed that the legislation "for the first time" provides financial assistance from the federal government to state and local governments "to improve their election infrastructure," making "funds available to those jurisdictions that want to modernize their systems." Id. at 32, 2001 WL 1579545, at *32. There is nothing absurd or unreasonable in a legislative judgment that such assistance should be available to all United States jurisdictions, along with the corresponding obligation to comply with national standards for maintaining accurate voter registration records.

We thus agree with the district court -- and the prior panel -- that "a sensible reading" of HAVA section 303(a)(4) compels the

conclusion that Congress intended the obligations it sets forth to apply to all jurisdictions within HAVA's definition of "State." Colón-Marrero, 703 F.3d at 138; Colón-Marrero, No. 12-1749CCC, 2015 WL 3508142, at *3 n.3 (D.P.R. June 4, 2015) (quoting panel opinion). Accordingly, we hold that, under the plain language of HAVA section 303(a)(4)(A), Puerto Rico may not deactivate voters unless they have not responded to a notice and did not vote in two consecutive general elections for federal office. See 52 U.S.C. § 21083(a)(4)(A).

## B. May plaintiffs seek a remedy under HAVA?

Appellant argues that, even if Puerto Rico election officials must comply with HAVA's requirements, plaintiffs' claims must be dismissed because individuals have no private right of action to seek a remedy under the statute. Although the parties debated this contention in their post-remand memoranda to the district court, the court did not directly address the issue. Its ruling, however, reflects an implicit conclusion that plaintiffs have properly sought relief under HAVA. To evaluate the correctness of that determination, we must closely examine the statute against the backdrop of the applicable precedent.

### 1. HAVA's Enforcement Provisions

HAVA by its terms does not create a private right of action. The statute, however, does expressly provide two mechanisms for remedying grievances: (1) a civil action brought by the Attorney

General, 52 U.S.C. § 21111,[19] and (2) in states receiving funds under HAVA, "[e]stablishment of State-based administrative complaint procedures," id. § 21112(a).[20] States that do not receive HAVA funds must either certify that they have a comparable administrative scheme or submit a detailed compliance plan showing "the steps the State will take to ensure that it meets the [statute's] requirements." Id. § 21112(b)(1)(B). The code sections containing these two procedures constitute a separate subchapter of HAVA titled "Enforcement." See id. §§ 21111, 21112.

---

[19] Section 21111 states in full:

> The Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements [required by HAVA].

[20] Under the required administrative scheme, "any person who believes that there is a violation" of HAVA's voting and registration requirements may file a complaint with the state. 52 U.S.C. § 21112(a)(2)(B). If the state determines that a violation occurred, it must "provide the appropriate remedy." Id. § 21112(a)(2)(F). If the state finds no violation, it must "dismiss the complaint and publish the results of the procedures." Id. § 21112(a)(2)(G). If the state does not make a final determination on the complaint within 90 days, the issue must be resolved "under alternative dispute resolution procedures established" for such purpose. Id. § 21112(a)(2)(H), (I).

## 2. Governing Law

Even when a federal statute does not explicitly provide for a private remedy, two different paths may be available to individuals seeking to enforce their rights under the provision. The statute may either include an implied right of action under the provision itself or be enforceable through a cause of action brought under 42 U.S.C. § 1983. See generally City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 119-21 (2005); Gonzaga Univ. v. Doe, 536 U.S. 273, 283-85 (2002).[21]  The inquiries to determine whether such paths exist are similar and begin with the same question: did Congress intend to create a federal right?  See Gonzaga Univ., 536 U.S. at 283.  One difference between the two approaches is that an individual seeking to sue under an implied right of action "must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'" Id. at 284 (quoting Alexander v. Sandoval, 532 U.S. 275, 286 (2001)).  By contrast, an individual pursuing relief under § 1983 "do[es] not have the burden of showing an intent to create a

---

[21] Section 1983 does not itself confer any rights, but "merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e., rights independently 'secured by the Constitution and laws' of the United States."  Gonzaga Univ., 536 U.S. at 285.

private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes."  Id.

Plaintiffs in this case assert a remedy only under § 1983, and we therefore examine that pathway to relief.  If a plaintiff satisfies the threshold inquiry and demonstrates that Congress intended to confer an individual right, the right is presumptively enforceable by § 1983.  Id.  To rebut the presumption, the defendant must show that Congress "shut the door to private enforcement either expressly" in the statute creating the right, "or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983,'" id. at 284 n.4 (quoting Blessing v. Freestone, 520 U.S. 329, 341 (1997)).

### 3.  Does HAVA section 303(a)(4) create an individual right?

Taken as a whole, HAVA is aimed at "Election Administration Improvement" -- the title of the United States Code chapter in which it is codified -- and many of its provisions are therefore framed as requirements for the state officials who are in charge of the election process.  Subchapter I, for example, provides for payments to states to facilitate improvements in their election procedures and, among other things, it directs states to use such funds to carry out tasks such as educating voters, training poll workers, or establishing voter fraud hotlines.  See 52 U.S.C. § 20901.  Subchapter II establishes an independent Election

Assistance Commission, id. § 20921, to "serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections," id. § 20922, and Subchapter V establishes the "Help America Vote College Program," id. § 21121. Subchapter III -- the one directly pertinent to this case -- is titled "Uniform and Nondiscriminatory Election Technology and Administration Requirements." See id. §§ 21081-21085. Its provisions include HAVA section 303, which itself is titled "Computerized statewide voter registration list requirements and requirements for voters who register by mail." Id. § 21083. Subchapter III also imposes requirements for "voting systems" generally,[22] public posting of information on election days, and provisional voting. Id. §§ 21081-82.

The fact that many of HAVA's provisions -- indeed, probably most of them -- are crafted in regulatory terms rather than in terms of voters' rights does not bar a conclusion that a particular provision confers an individual right. The Supreme Court has made clear that generalized language in some sections of a statute is

---

[22] These include, for example, that a "voting system used in an election for Federal office" "provide the voter with the opportunity (in a private and independent manner) to change the ballot or correct any error before the ballot is cast and counted," 52 U.S.C. § 21081(a)(1)(A)(ii), and measures to ensure accessibility for individuals with disabilities, id. § 21081(a)(3)(A).

not a barrier to a private right of action under another section of the same statute. For example, in Blessing, the Supreme Court examined provisions of Title IV-D of the Social Security Act that the plaintiffs had relied upon, concluding that they did not give rise to individualized rights because they were designed "to guide the State in structuring its systemwide efforts at enforcing support obligations." 520 U.S. at 344. The Court noted, however, that some provisions of Title IV-D might confer enforceable individual rights, and it returned the case to the district court "to determine exactly what rights, considered in their most concrete, specific form, respondents are asserting." Id. at 346; see also Sandoval, 532 U.S. at 288-89 (contrasting § 601 of Title VI of the Civil Rights Act of 1964, which creates individual rights, and § 602, which does not).

Hence, the question before us is whether the specific provision on which plaintiffs rely -- HAVA section 303(a)(4)(A) -- creates a private right. The Supreme Court has identified three factors to guide the inquiry into whether Congress has "unambiguously conferred [a] right to support a cause of action brought under § 1983." Gonzaga Univ., 536 U.S. at 283.

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose

> a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

Blessing, 520 U.S. at 340-41 (quoting Wright v. Roanoke Redev. & Hous. Auth., 479 U.S. 418, 431 (1987)) (citations omitted).

Establishing the first factor -- the intent to benefit the plaintiff -- requires more than a showing that the plaintiff is an intended beneficiary of the statute or "within the general zone of interest that the statute is intended to protect." Gonzaga Univ., 536 U.S. at 283. Rather, "the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." Rancho Palos Verdes, 544 U.S. at 120; see also Gonzaga Univ., 536 U.S. at 281 ("Since the [Adoption Assistance and Child Welfare Act of 1980] conferred no specific, individually enforceable rights, there was no basis for private enforcement, even by a class of the statute's principal beneficiaries." (citing Suter v. Artist M., 503 U.S. 347, 357 (1992))); California v. Sierra Club, 451 U.S. 287, 294 (1981) ("The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries.").

The targeted portion of HAVA section 303(a)(4) fits comfortably among those statutory provisions found to create individually enforceable rights because of their "unmistakable

focus on the benefited class." Gonzaga Univ., 536 U.S. at 287 (quoting Cannon v. Univ. of Chi., 441 U.S. 677, 691 (1979)). Although section 303(a)'s primary focus is the obligation of states to adopt measures to ensure accurate registration records, and section 303(a)(4)(A) furthers that objective by directing state officials to implement certain safeguards for voter roll maintenance, the fact that a statutory command is directed at state officials as part of a broader plan for implementation does not preclude it from likewise creating privately enforceable rights. Language that directs state officials in the implementation of statutory objectives may still create an enforceable right where it "mentions a specific, discrete beneficiary group within the statutory text" and "speaks in individualistic terms, rather than at the aggregate level of institutional policy or practice." Rio Grande Cmty. Health Ctr. v. Rullan, 397 F.3d 56, 74 (1st Cir. 2005); accord Bryson v. Shumway, 308 F.3d 79, 88 (1st Cir. 2002).

The relevant text of section 303(a)(4)(A) satisfies these requirements. It specifies a discrete class of beneficiaries -- "registrants" -- and describes specific procedures for removing individual registrants from the state's active voter rolls, including the requirement of notice and failure to vote in consecutive elections. 52 U.S.C. § 21083(a)(4)(A). Moreover, the command of the provision's final clause, that "no registrant may be removed solely by reason of a failure to vote," id., resembles

the language in Titles VI and IX of the Civil Rights Act of 1964 that the Supreme Court has highlighted as indicative of Congress's intent to create an individual right: "No person . . . shall . . . be subjected to discrimination." Gonzaga Univ., 536 U.S. at 287 (quoting 20 U.S.C. § 1681(a); 42 U.S.C. § 2000d). On its face, section 303(a)(4)(A) confers a "right" on every "registrant" not to be removed from a state's active registry for failure to participate in one general election.

The rights-creating role of this language is reinforced by the contrast drawn by the Supreme Court in Gonzaga University between the language quoted above from Titles VI and IX and the language of the Family Educational Rights and Privacy Act of 1974 ("FERPA") under review in that case. The Court pointed out that the FERPA provisions "speak only to the Secretary of Education, directing that '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'" 536 U.S. at 287 (quoting 20 U.S.C. § 1232g(b)(1)). The Court observed that "[t]his focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of 'individual entitlement' that is enforceable under § 1983." Id. (quoting Blessing, 520 U.S. at 343). The Court thus concluded that the FERPA provisions under scrutiny do not confer enforceable rights. Id.

Similarly illustrative is the Court's decision in Blessing. There, the Court observed that a provision requiring child support programs to operate in "substantial compliance" with Title IV-D of the Social Security Act "[f]ar from creat[es] an individual entitlement to services," and instead provides a "standard [that] is simply a yardstick for the Secretary to measure . . . systemwide performance." 520 U.S. at 343. The Court in Sandoval likewise found the necessary "'rights-creating language'" absent from § 602 of Title VI of the Civil Rights Act of 1964. 532 U.S. at 288 (quoting Cannon, 414 U.S. at 690). The Court explained:

> Whereas § 601 decrees that "[n]o person . . . shall . . . be subjected to discrimination," 42 U.S.C. § 2000d, the text of § 602 provides that "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [§ 601]," 42 U.S.C. § 2000d-1. Far from displaying congressional intent to create new rights, § 602 limits agencies to "effectuat[ing]" rights already created by § 601.

Id. at 288-89. The Court then utilized the "two steps removed" imagery to which it returned the next year (as quoted above) in Gonzaga University, 536 U.S. at 287:

> And the focus of § 602 is twice removed from the individuals who will ultimately benefit from Title VI's protection. Statutes that focus on the person regulated rather than the individuals protected create "no implication of an intent to confer rights on a particular class of persons." Section 602 is yet a step further removed: It focuses neither on the individuals protected nor even on the funding

- 38 -

> recipients being regulated, but on the
> agencies that will do the regulating.

*Sandoval*, 532 U.S. at 289 (citation omitted) (quoting *Sierra Club*, 451 U.S. at 294).

By contrast, no gap exists between the operative text of HAVA section 303(a)(4)(A) and the persons whose interests are at stake. The statutory proscription -- "no registrant may be removed" -- directly and explicitly protects individual voters. That rights-creating language explains why appellant incorrectly invokes the Supreme Court's one-paragraph decision in *Brunner* v. *Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam), in support of her view that plaintiffs may not bring a private action under section 303(a)(4)(A). In *Brunner*, the Court vacated a temporary restraining order directing Ohio's Secretary of State to update the state's voter registration database, having concluded that the plaintiffs were not sufficiently likely to prove that HAVA section 303 gave them a private right of action. 555 U.S. at 5-6. The subsection of section 303 at issue in *Brunner*, however, directs action by the state's chief election official,[23] and it

---

[23] The subsection, 52 U.S.C. § 21083(a)(5)(B)(i), states:

> The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the

- 39 -

lacks any language showing an intent to create individually enforceable rights. Thus, Brunner does not govern the private-right question here.[24] Cf. Sandusky Cty. Democratic Party v. Blackwell, 387 F.3d 565, 572-73 (6th Cir. 2004) (per curiam) (holding that the rights-creating language of HAVA § 302(a)(2), 52 U.S.C. § 21082(a)(2) -- stating that individuals "shall be permitted to cast a provisional ballot" -- is unambiguous).

Moreover, it is noteworthy that HAVA, including section 303(a)(4), was enacted pursuant to Congress's authority under the Elections Clause of the Constitution. See H.R. Rep. 107-329, pt. 1, at 57, 2001 WL 1579545, at *57; U.S. Const. art. I, § 4, cl. 1. The Supreme Court has observed that statutes enacted under Congress's spending power rarely give rise to enforceable individual rights, as "the typical remedy for state noncompliance with federally imposed conditions [in spending legislation] is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to

_____

accuracy of the information provided on applications for voter registration.

[24] We refuse to draw any significance from the Supreme Court's broad reference to section 303, rather than to the specific subsection at issue, when it raised doubts about the availability of a private remedy. The Brunner Court reproduced the specific provision it was considering, see 555 U.S. at 5 n.*, and -- particularly given the one-paragraph per curiam -- it would be absurd to construe the decision as precedent on another subsection whose language it did not examine.

- 40 -

the State." Gonzaga Univ., 536 U.S. at 280 (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 28 (1981)). The Court further commented that its "more recent decisions . . . have rejected attempts to infer enforceable rights from Spending Clause statutes," absent language that unambiguously confers such rights on the statute's beneficiaries. Id. at 281. Here, the provision at issue is both authorized by constitutional authority more specific than the spending power and contains language unambiguously conferring individual rights.

The other two factors of the private-right inquiry described in Blessing are easily satisfied by section 303(a)(4). Enforcing the right to retention on a state's active voter registry would impose no "strain [on] judicial competence," as the right is concrete and well-defined. Blessing, 520 U.S. at 341. The specificity of the provision's directives shields against potentially disparate outcomes, bolstering the conclusion that the language is rights-creating. See Rullan, 397 F.3d at 75. The statute's requirements are also "couched in mandatory, rather than precatory, terms," and "unambiguously impose a binding obligation." Id.; accord Sandusky, 387 F.3d at 573 ("[T]here can be no doubt that HAVA as a whole is 'couched in mandatory, rather than precatory, terms.'").

We therefore conclude that plaintiffs are entitled to a presumption that HAVA section 303(a)(4)(A) provides them with a

- 41 -

right that is enforceable under § 1983. Appellant makes no meaningful attempt to rebut this presumption, and we could thus end our analysis here. Recognizing the importance of this issue, however, we explain why the rationales the Supreme Court has found adequate to defeat such a presumption do not apply here.

**4. Did Congress manifest an intent to foreclose a remedy under § 1983?**

Congressional intent to "shut the door to private enforcement" of a federal statute may be shown by means of language in the act itself specifically foreclosing a remedy under § 1983 or by implication from Congress's creation of "a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Gonzaga Univ., 536 U.S. at 284 n.4 (quoting Blessing, 520 U.S. at 341). We have found no express language in HAVA rejecting a private remedy under § 1983 for violation of the individual right that we have determined is created by section 303(a)(4)(A). We thus must consider whether an individual remedy under § 1983 is compatible with the enforcement mechanisms that HAVA does provide "for the deprivation of [the] federally secured right" it creates. Wright, 479 U.S. at 424 (internal quotation marks omitted).

The Supreme Court has cautioned against "lightly conclud[ing] that Congress intended to preclude reliance on § 1983," id. at 423-24 (quoting Smith v. Robinson, 468 U.S. 992, 1012 (1984)), and

- 42 -

the availability of a private remedy through an administrative mechanism is not necessarily enough to show such intent, see, e.g., Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989). Rather, to confine individuals to a statutory remedy, the legislation must reveal Congress's purpose to exclude independent relief in federal court pursuant to § 1983. See, e.g., Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 523 (1990) (finding no "indication that Congress specifically intended that [the statute's] administrative procedure replace private remedies available under § 1983").

The rarity of that deliberate exclusion was noted in Rancho Palos Verdes, see 544 U.S. at 121, where the Supreme Court observed that it previously had rejected § 1983 as an available remedy for violations of federal statutory rights in only two cases: Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1 (1981), and Smith, 468 U.S. at 1012. In Sea Clammers, the environmental statutes at issue contained "unusually elaborate enforcement provisions," allowing "any interested person" to challenge actions of the Administrator of the Environmental Protection Agency in federal appeals courts, 453 U.S. at 13-14, and, in addition, "authoriz[ing] private persons to sue for injunctions to enforce these statutes," id. at 14. Similarly, in Smith, the Court found that "the carefully tailored administrative and judicial mechanism," 468 U.S. at 1009, in the Education of the

Handicapped Act manifested "Congress' intent that each child's individual educational needs be worked out through a process that begins on the local level and includes ongoing parental involvement, detailed procedural safeguards, and a right to judicial review," id. at 1011. Hence, the Court concluded that Congress meant to foreclose "the ability of a handicapped child to go directly to court with an equal protection claim." Id.

In Rancho Palos Verdes, the Court added a third exemplar to the short list of statutes found to preclude relief under § 1983 for violation of a federal right. See 544 U.S. at 120-21. The statute at issue, a provision of the Telecommunications Act of 1996 ("TCA"), 42 U.S.C. § 332(c)(7), contains a remedial system that includes judicial review, but "limits relief in ways that § 1983 does not." Id. at 122. The statutory period for filing a claim is shorter, the district court must hear the claim on an expedited basis, and the available remedies do not include attorney's fees and costs. Id. at 122-23. The Court concluded that enforcement of § 332(c)(7) through § 1983 would "distort th[is] scheme of expedited judicial review and limited remedies." Id. at 127. The Court thus held that "the TCA -- by providing a judicial remedy different from § 1983 in § 332(c)(7) itself -- precluded resort to § 1983." Id.[25]

---

[25] The Court emphasized in Rancho Palos Verdes that the availability of a private judicial remedy under a statute does not

- 44 -

In its discussion, the Court in Rancho Palos Verdes observed that, for statutory violations, the "dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have not" has been "the existence of a more restrictive private remedy" in the statute itself. Id. at 121. Importantly, however, it is not a remedy of any type that has supported an inference that Congress intended to foreclose private enforcement through § 1983. "[A] plaintiff's ability to invoke § 1983 cannot be defeated simply by '[t]he availability of administrative mechanisms to protect the plaintiff's interests.'" Blessing, 520 U.S. at 347 (quoting Golden State, 493 U.S. at 106). The Supreme Court has emphasized that, in all of its cases holding that § 1983 is available, the statutes did not provide a private judicial remedy for the violation of federal rights. See Rancho Palos Verdes, 544 U.S. at 121-22 (citing cases).

HAVA's enforcement provisions, described above in Section III.B.1, fall clearly on the § 1983 side of the dividing line. There is no private judicial remedy provided in the statute. The Attorney General may bring a civil action in federal court, 52 U.S.C. § 21111, but the only remedial option for individuals is to file complaints with the state, id. § 21112(a)(2)(B). Pursuant to

conclusively establish congressional intent to foreclose § 1983 relief, but it supports an inference that can be "overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." 544 U.S. at 122.

the required administrative procedures, a finding by the state that no violation occurred results in dismissal of the complaint. Id. § 21112(a)(2)(G). Far from indicating congressional intent to foreclose a private remedy under § 1983, these limited enforcement options reflect an intention to leave that door wide open. See, e.g., Wright, 479 U.S. at 427 ("In both Sea Clammers and Smith v. Robinson, the statutes at issue themselves provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy. There is nothing of that kind found in the . . . Housing Act."); accord Sandusky, 387 F.3d at 573; Bay Cty. Democratic Party v. Lund, 347 F. Supp. 2d 404, 426-27 (E.D. Mich. 2004); cf. Gonzaga Univ., 536 U.S. at 289-90 (noting that the detailed federal enforcement procedures in FERPA "squarely distinguish this case" from those "where an aggrieved individual lacked any federal review mechanism").

We thus find no congressional intention to preclude federal judicial review of violations of section 303(a)(4)(A) that are asserted through the vehicle of a private lawsuit brought under § 1983.

### IV. Conclusion

We hold that HAVA section 303(a)(4)(A) invalidates the voter deactivation procedure of Article 6.012 of Puerto Rico Law 78 and, hence, individuals may not be removed from the Commonwealth's active voter registry for federal elections unless they have failed

- 46 -

to respond to a notice and did not vote in the preceding two consecutive general federal elections. Because HAVA affords plaintiffs an individually enforceable right to remain on the active voter registry absent those failures to act, and appellant has not shown that Congress intended to foreclose a remedy under 42 U.S.C. § 1983, plaintiffs properly sought relief for their improper removal in this federal action.

Accordingly, we affirm the district court's grant of declaratory and injunctive relief barring the SEC from removing voters from the official list of eligible voters for federal elections unless HAVA's requirements have been met. We recognize that questions may arise concerning the administrative steps necessary to bring the SEC's procedures into compliance with HAVA. The district court should therefore retain jurisdiction over this case for the time necessary to resolve any conflicts that arise between the parties during the transition.

<u>So ordered.</u>  <u>Costs are awarded to plaintiffs</u>.

Appendix follows.

**52 U.S.C.A. § 21083**

**§ 21083. Computerized statewide voter registration list requirements and requirements for voters who register by mail**

**(a) Computerized statewide voter registration list requirements**

**(1) Implementation**

**(A) In general**

Except as provided in subparagraph (B), each State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State (in this subsection referred to as the "computerized list"), and includes the following:

> **(i)** The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State.
> **(ii)** The computerized list contains the name and registration information of every legally registered voter in the State.
> **(iii)** Under the computerized list, a unique identifier is assigned to each legally registered voter in the State.
> **(iv)** The computerized list shall be coordinated with other agency databases within the State.
> **(v)** Any election official in the State, including any local election official, may obtain immediate electronic access to the information contained in the computerized list.
> **(vi)** All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official.
> **(vii)** The chief State election official shall provide such support as may be required so that local election officials are able to enter information as described in clause (vi).
> **(viii)** The computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State.

**(B) Exception**

The requirement under subparagraph (A) shall not apply to a State in which, under a State law in effect continuously on and after October 29, 2002, there is no voter registration requirement for individuals in the State with respect to elections for Federal office.

**(2) Computerized list maintenance**

**(A) In general**

The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis as follows:

> **(i)** If an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.), including subsections (a)(4), (c)(2), (d), and (e) of section 8 of such Act (42 U.S.C. 1973gg-6).
> **(ii)** For purposes of removing names of ineligible voters from the official list of eligible voters--
>> **(I)** under section 8(a)(3)(B) of such Act (42 U.S.C. 1973gg-6(a)(3)(B)), the State shall coordinate the computerized list with State agency records on felony status; and
>> **(II)** by reason of the death of the registrant under section 8(a)(4)(A) of such Act (42 U.S.C. 1973gg-6(a)(4)(A)), the State shall coordinate the computerized list with State agency records on death.
> **(iii)** Notwithstanding the preceding provisions of this subparagraph, if a State is described in section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-2(b)), that State shall remove the names of ineligible voters from the computerized list in accordance with State law.

**(B) Conduct**

The list maintenance performed under subparagraph (A) shall be conducted in a manner that ensures that--

> **(i)** the name of each registered voter appears in the computerized list;
> **(ii)** only voters who are not registered or who are not eligible to vote are removed from the computerized list; and
> **(iii)** duplicate names are eliminated from the computerized list.

**(3) Technological security of computerized list**

The appropriate State or local official shall provide adequate technological security measures to prevent the unauthorized access to the computerized list established under this section.

**(4) Minimum standard for accuracy of State voter registration records**

   The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following:

**(A)** A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.), registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.

**(B)** Safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters.

**(5) Verification of voter registration information**

**(A) Requiring provision of certain information by applicants**

   **(i) In general**
     Except as provided in clause (ii), notwithstanding any other provision of law, an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes--
     **(I)** in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or
     **(II)** in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number.
   **(ii) Special rule for applicants without driver's license or social security number**
     If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number, the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes. To the extent that the State has a computerized list in effect under this subsection and the list assigns unique identifying numbers to registrants, the number assigned under this clause shall be the unique identifying number assigned under the list.
   **(iii) Determination of validity of numbers provided**
     The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law.

**(B) Requirements for State officials**

        **(i) Sharing information in databases**

                The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

        **(ii) Agreements with Commissioner of Social Security**

                The official responsible for the State motor vehicle authority shall enter into an agreement with the Commissioner of Social Security under section 405(r)(8) of Title 42 (as added by subparagraph (C)).

**(C) Omitted**

**(D) Special rule for certain States**

        In the case of a State which is permitted to use social security numbers, and provides for the use of social security numbers, on applications for voter registration, in accordance with section 7 of the Privacy Act of 1974 (5 U.S.C. 552a note), the provisions of this paragraph shall be optional.

**(b) Requirements for voters who register by mail**

**(1) In general**

        Notwithstanding section 6(c) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-4(c)) and subject to paragraph (3), a State shall, in a uniform and nondiscriminatory manner, require an individual to meet the requirements of paragraph (2) if--

**(A)** the individual registered to vote in a jurisdiction by mail; and

**(B)(i)** the individual has not previously voted in an election for Federal office in the State; or

**(ii)** the individual has not previously voted in such an election in the jurisdiction and the jurisdiction is located in a State that does not have a computerized list that complies with the requirements of subsection (a).

**(2) Requirements**

**(A) In general**

        An individual meets the requirements of this paragraph if the individual--

        **(i)** in the case of an individual who votes in person--

                **(I)** presents to the appropriate State or local election official a current and valid photo identification; or

**(II)** presents to the appropriate State or local election official a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

**(ii)** in the case of an individual who votes by mail, submits with the ballot--

**(I)** a copy of a current and valid photo identification; or

**(II)** a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.

**(B) Fail-safe voting**

**(i) In person**

An individual who desires to vote in person, but who does not meet the requirements of subparagraph (A)(i), may cast a provisional ballot under section 21082(a) of this title.

**(ii) By mail**

An individual who desires to vote by mail but who does not meet the requirements of subparagraph (A)(ii) may cast such a ballot by mail and the ballot shall be counted as a provisional ballot in accordance with section 21082(a) of this title.

**(3) Inapplicability**

Paragraph (1) shall not apply in the case of a person--

**(A)** who registers to vote by mail under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-4) and submits as part of such registration either--

**(i)** a copy of a current and valid photo identification; or

**(ii)** a copy of a current utility bill, bank statement, government check, paycheck, or government document that shows the name and address of the voter;

**(B)(i)** who registers to vote by mail under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-4) and submits with such registration either--

**(I)** a driver's license number; or

**(II)** at least the last 4 digits of the individual's social security number; and

**(ii)** with respect to whom a State or local election official matches the information submitted under clause (i) with an existing State identification record bearing the same number, name and date of birth as provided in such registration; or

**(C)** who is--

**(i)** entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act [52 U.S.C.A. § 20301 et seq.];

**(ii)** provided the right to vote otherwise than in person under section 20102(b)(2)(B)(ii) of this title; or

**(iii)** entitled to vote otherwise than in person under any other Federal law.

**(4) Contents of mail-in registration form**

**(A) In general**

The mail voter registration form developed under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-4) shall include the following:

**(i)** The question "Are you a citizen of the United States of America?" and boxes for the applicant to check to indicate whether the applicant is or is not a citizen of the United States.

**(ii)** The question "Will you be 18 years of age on or before election day?" and boxes for the applicant to check to indicate whether or not the applicant will be 18 years of age or older on election day.

**(iii)** The statement "If you checked 'no' in response to either of these questions, do not complete this form.".

**(iv)** A statement informing the individual that if the form is submitted by mail and the individual is registering for the first time, the appropriate information required under this section must be submitted with the mail-in registration form in order to avoid the additional identification requirements upon voting for the first time.

**(B) Incomplete forms**

If an applicant for voter registration fails to answer the question included on the mail voter registration form pursuant to subparagraph (A)(i), the registrar shall notify the applicant of the failure and provide the applicant with an opportunity to complete the form in a timely manner to allow for the completion of the registration form prior to the next election for Federal office (subject to State law).

**(5) Construction**

Nothing in this subsection shall be construed to require a State that was not required to comply with a provision of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) before October 29, 2002, to comply with such a provision after October 29, 2002.