PER CURIAM.
Plaintiff is an otherwise qualified voter in Puerto Rico who has been removed from the voter registration roll because she did not vote in the 2008 general election, pursuant to Article 6.012 of Puerto Rico Law No. 78.[1] She seeks a preliminary injunction to redress that removal. *136 On October 18, 2012, we affirmed the denial of an injunction that would have required the government to reinstate more than 300,000 voters to the registration roll in time for the upcoming federal election on November 6. The record and the parties’ arguments failed to demonstrate that such extraordinary relief could be granted only weeks before the election without creating uncertainty and confusion in the Puerto Rico electoral process. Although we recognized the importance of plaintiffs claims, we declined to jeopardize the electoral process as a whole by acting precipitously on evolving claims that had not yet been adequately analyzed or developed by plaintiff. Hence, we affirmed the district court’s denial of a preliminary injunction. We now explain that decision more fully and remand for further proceedings consistent with this opinion.
I.
Plaintiff filed this suit on September 12, 2012, claiming that federal law prohibited the Commonwealth government from removing her from the voting roll for the upcoming election of Puerto Rico’s only elected federal officer, the Resident Commissioner. She alleged that Article 6.012 was unlawful under both the National Voter Registration Act (“NVRA”) and Section 308(a)(4)(A) of the Help America Vote Act of 2002 (“HAVA”), 42 U.S.C. § 15483(a)(4)(A).[2] The district court denied plaintiffs request for a preliminary injunction. Plaintiff immediately filed an appeal, and after nearly two hours of oral argument during a special session of this court on October 11, we concluded that plaintiff had shown a likelihood of success on the merits of her claim.
However, the panel also determined that serious factual questions remained as to the balance of harms and the public interest in ordering the immediate reinstatement of the more than 300,000 voters who had been stricken from the registration roll.[3] The parties offered competing assertions on the feasibility of granting plaintiffs requested relief. Given that no evidentiary hearing had been held in the district court, we had “no basis for assessing the validity of the parties’ factual claims.” We thus retained jurisdiction while remanding the case to the district court for fact-finding, forthwith, on the feasibility of reinstating the affected voters in time for the November 6 election.
The district court heard nearly sixteen hours of testimony during an evidentiary hearing on October 15 and 16. Both sides presented several witnesses who testified to the availability of extra ballots and other electoral materials, the number of available polling places, training requirements for extra poll workers, and the availability of additional volunteer poll monitors. On October 17, the district court certified its findings. In these findings, the court (1) concluded that it would be feasible to allow the 1-8 voters to vote in the general election so long as this court ordered such relief by Tuesday, October 23, (2) expressed no opinion on whether it would be feasible to reactivate the 1-8 voters only for the federal portion of the election, i.e., for the position of Resident Commissioner, and (3) indicated that this court would need to craft a same-day recusal procedure to reduce both the risk of reactivated 1-8 *137 voters casting votes in the incorrect precinct and the risk of fraudulent votes cast by 1-8 voters who were no longer residents of Puerto Rico.[4]
II.
Our view is that the NVRA by its terms does not apply to Puerto Rico, and it therefore cannot provide any relief for plaintiff in this case. Although the statute does not explicitly exclude Puerto Rico from its scope, the statutory language and legislative history reveal Congress’s intent to do so.[5] Section 1 defines “State” as “a State of the United States and the District of Columbia.” 42 U.S.C. § 1973gg-l(4). The express inclusion of one non-state jurisdiction is telling evidence that other such jurisdictions were intentionally excluded. Similarly, while Congress adopted in the NVRA the definition of “election” and “Federal office” from the Federal Election and Campaign Act of 1971 (“FECA”), see 42 U.S.C. § 1973gg-l(l), (2), the NVRA definition of “State” departs from FECA’s. FECA defines “State” as “a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States.” 2 U.S.C. § 431(12) (emphasis added). In light of its use of other FECA definitions, Congress’s rejection of the broad definition of “State” evidences a deliberate decision to more narrowly define that term in the NVRA.[6]
The NVRA’s legislative history points in the same direction. An early version of the statute adopted FECA’s definition of “State,” which expressly includes Puerto Rico. See H.R. No. 101-396 (1990) (adopting the definition of State in § 431 of FECA). This definition was later replaced, however, with the current version limiting “State” to the United States and the District of Columbia. See H.R.Rep. No. 103-66 (1993) (Conf.Rep.), reprinted in 1993 U.S.C.C.A.N. 140, 140. Moreover, when discussing the NVRA before its passage, several members of Congress indicated their understanding that the territories, including Puerto Rico, would not be covered by the statute’s definition of “State.” For example, New York Representative Solomon observed that “this piece of legislation ... mandates a cost on all 50 States, but not on the territories ... because the territories are not included.” 139 Cong. Rec. H504 (daily ed: Feb. 4, 1993); see also id. at S5739-01 (daily ed. May 11, 1993) (statement of Sen. Helms)(“[T]his conference will cost the *138 States, all 50 of them ... millions of dollars[.]”); id. at S2913 (daily ed. March 16, 1993) (statement of Sen. Chafee) (“[This bill] requires all 50 states to adopt uniform, federally mandated voter registration practices.”).[7]
The textual signals and the legislative history, taken together, constitute persuasive evidence that Congress did not intend to include Puerto Rico as a “State” under the NVRA. Despite plaintiffs failure to establish a likelihood of success on the merits of her NVRA claim, however, we determined that she successfully made such a showing on the merits of her claim under Section 303(a)(4)(A) of HAVA that she has a right to vote for Resident Commissioner. The express inclusion of Puer-to Rico within HAVA’s definition of “State,” see 42 U.S.C. § 15541, together with a sensible reading of that statute’s relevant substantive provision, see id. § 15483(a)(4)(A),[8] persuaded us that plaintiff had established a likelihood of success on her federal election claim under HAVA. By contrast, it is an open and difficult question — one not addressed by plaintiff— whether HAVA would provide a basis for a federal court ordering the reinstatement of voters in Commonwealth elections. To the extent that the language of the October 11 order suggested that our determination also extended to plaintiffs right to vote in Puerto Rico’s local elections, that language did not and does not reflect the view of the majority.
Our view of the scope of the relief at issue was informed by the argument advanced by plaintiff in the district court and on appeal. Plaintiff had repeatedly asked the district court and this court only to “immediately activate her and all other[] similarly situated persons as registered voters in the general registry of voters entitled to vote in the upcoming election for Resident Commissioner.” Colón-Mar-rero v. Conty-Pérez, No. 12-cv-01749-CCC, at 3 (D.P.R. Sept. 18, 2012) (order denying preliminary injunction) (emphasis supplied). The broader question of a right to vote for local Puerto Rico offices and in the plebiscite in the upcoming election was raised by plaintiff for the first time before us in her supplemental briefing to this court following the district court’s fact-finding.
Plaintiff was fully aware of the limited nature of her original request. Indeed, Judge Cerezo wisely brought the distinction between the right to vote for the Resident Commissioner and the right to vote on every ballot in the general election to the parties’ attention at the outset of the hearing on October 15. Thus, despite the language in the order of October 11, it would have been prudent for plaintiff to fully develop evidence concerning the feasibility of both potential remedies-voting only for the Resident Commissioner (the relief originally sought) or voting in the election generally (the relief now sought). Yet plaintiff elicited scant evidence at the evidentiary hearing specifically about the feasibility of reinstating the 1-8 voters solely for the purpose of voting for the Resident Commissioner. As a result, the district court made no finding on the feasibility of reinstating the 1-8 voters only for the Resident Commissioner election. That feasibility was a major concern for the majority because the candidates for both *139 Resident Commissioner and Governor appear on the same ballot.
We also had concerns about the absence of same-day recusal procedures, an issue noted by the district court. While Professor Acevedo testified that there were sufficient materials and personnel available to successfully reinstate the 1-8 voters for the November 6 general election, he pointed out that Puerto Rico law does not include a process by which poll watchers can challenge the validity of a voter’s claim to residency on the day of the election. According to the testimony of several witnesses, establishing that the 1-8 voters are residents of the precinct in which they seek to vote is necessary because the 1-8 voters have not updated their voter information since before the November 2008 general election. It is therefore safe to assume that at least some of them now reside in different precincts than they did in 2008, while others may no longer be residents of Puerto Rico at all. In addition, a recusal mechanism on the day of the election would address the fact that the 1-8 voters would be added to the registration roll without the voter review ordinarily conducted under Commonwealth law early in an election year. Even if it were appropriate for a federal court to prescribe alternative recusal procedures, we would be ill equipped to do so in the short time remaining before the election.
Moreover, beyond the concerns about our authority and competency to craft re-cusal procedures, we note our global concern with plaintiffs delay in bringing this action. Although the particular statute under which the defendants acted, Article 6.012 of Puerto Rico Law No. 78, was enacted only last year, the procedures that plaintiff challenges have existed in some form since at least the 1970s. Additionally, HAVA itself was adopted nearly a decade ago, and two federal election cycles have been completed since then. Yet plaintiff did not file her complaint until September 12, 2012, less than two months before a general election that had long been scheduled for November 6.
Thus, plaintiff here is in a similar position to the plaintiffs in Respect Maine PAC v. McKee, 622 F.3d 13 (1st Cir.2010), who also sought to challenge long-standing election laws in the weeks leading up to an election. We held there that the plaintiffs’ claims of irreparable harm were undermined by the fact that their “ ‘emergency [was] largely one of their own making.” Id. at 16. Here, as well, on- the eve of a major election, plaintiff seeks to disrupt long-standing election procedures, which large portions of the electorate have used. Indeed, more than 200,000 voters who were deactivated for failing to vote in 2008 reactivated themselves and will be qualified to fully participate in the upcoming general election. Plaintiff herself had ample opportunity to reactivate her voting status. Under the current reactivation procedures, plaintiff could have reactivated herself by appearing in person at her local election commission office, a process that one witness testified can be completed “practically within minutes.” What is more, plaintiffs own expert witness Professor Acevedo testified that the election commission published notices in local newspapers urging qualified voters to reactivate.
In sum, for the reasons stated, we concluded in our order of October 18 that it would be improvident to grant plaintiffs requested relief with only eighteen days remaining before the general election. Hence, we denied plaintiffs request for a preliminary injunction.[9] We now remand *140 the ease to the district court for further proceedings consistent with this opinion.

So ordered.

. Two plaintiffs initially filed this action in the district court, but only one appeals. Plaintiff brings a facial challenge to Article 6.012, requesting equitable and declaratory relief under 42 U.S.C. § 1983. Though plaintiff did not seek class certification, her requested relief would have applied to all similarly situated voters. See City of Chicago v. Morales, 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) ("When asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question.”).

. Unlike Article 6.012, which allows a voter to be deactivated after failing to vote in one election, both the NVRA and HAVA allow deactivation only after a failure to vote in two consecutive elections. See 42 U.S.C. § 1973gg-6(b)(2)(B) & 42 U.S.C. § 15483(a)(4)(A).

. These deactivated voters are known as "I-8” voters.

. The court found the expert testimony of Professor Héctor Luis Acevedo to be particularly compelling. Acevedo stated that, because extra ballots already existed and additional polling places were available, preparations could be made to accommodate the 330,902 deactivated voters if the order to do so were given at least ten to twelve days before the election.

. Thus, the so-called “default rule” invoked by our dissenting colleague does not apply here. The rule derives from 48 U.S.C. § 734, which provides that federal laws "not locally inapplicable ... shall have the same force and effect in Puerto Rico as in the United States.” The rule does not come into play, however, where Congress manifests an intent to exclude Puerto Rico from a law’s coverage. See United States v. Acosta-Martinez, 252 F.3d 13, 18 (1st Cir.2001) (stating that the role of the federal court in determining a federal statute’s applicability to Puerto Rico is "restricted to determining [congressional] intent” if such intent can be discerned).

.It is true, as the dissent points out, that the NVRA’s definition of "Federal office,” also adopted from FECA, includes Resident Commissioner — an office that exists only in Puerto Rico. See 2 U.S.C. § 431(3). Given the multiple indications that Congress did not intend “State” to include Puerto Rico, however, the inclusion of Resident Commissioner as a "Federal office” is but one contrary signal in an otherwise consistent set of factors.

. The Department of Justice also takes the position that the NVRA does not extend to Puerto Rico. See Dep't of Justice Letter Brief, Oct. 10, 2012.

. Our dissenting colleague appears to rely on HAVA in construing the meaning of "State” in the NVRA. HAVA was enacted nearly a decade after the NVRA, and it thus cannot provide insight into Congress’s intent with respect to the earlier statute.

. We are not alone in holding that even where plaintiff has demonstrated a likelihood of sue- *140 cess, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own. Indeed, the Supreme Court has stated that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.” Purcell v. Gonzalez, 549 U.S. 1, 4-5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). Similarly, in Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914 (9th Cir.2003) (en banc) (per curiam), the Ninth Circuit concluded that plaintiffs had demonstrated a "possibility of success” on their claim under the Voting Rights Act, but concluded that on the eve of the election, there was no way to grant plaintiffs relief without causing significant harm to the general public.