FOR PUBLICATION
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FILED

NOV 02 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**LESLIE FELDMAN; LUZ
MAGALLANES; MERCEDEZ
HYMES; JULIO MORERA; CLEO
OVALLE; PETERSON ZAH, Former
Chairman and First President of the
Navajo Nation; THE DEMOCRATIC
NATIONAL COMMITTEE; DSCC,
AKA Democratic Senatorial Campaign
Committee; THE ARIZONA
DEMOCRATIC PARTY;
KIRKPATRICK FOR U.S. SENATE;
HILLARY FOR AMERICA**,

  Plaintiffs-Appellants,

**BERNIE 2016, INC.**,

  Intervenor-Plaintiff-
  Appellant,

 v.

**ARIZONA SECRETARY OF STATE'S
OFFICE; MICHELE REAGAN, in her
official capacity as Secretary of State of
Arizona; MARICOPA COUNTY
BOARD OF SUPERVISORS; DENNY
BARNEY; STEVE CHUCRI; ANDY
KUNASEK; CLINT HICKMAN;
STEVE GALLARDO, member of the
Maricopa County Board of Supervisors,
in their official capacities; MARICOPA
COUNTY**

No.  16-16698

D.C. No. 2:16-cv-01065-DLR
District of Arizona,
Phoenix

**ORDER**

**RECORDER AND ELECTIONS DEPARTMENT; HELEN PURCELL, in her official capacity as Maricopa County Recorder; KAREN OSBORNE, in her official capacity as Maricopa County Elections Director; MARK BRNOVICH, in his official capacity as Arizona Attorney General,**

Defendants-Appellees,

**THE ARIZONA REPUBLICAN PARTY**,

Intervenor-Defendant-Appellee.

**THOMAS**, Chief Judge:

Upon the vote of a majority of nonrecused active judges, it is ordered that this case be reheard en banc pursuant to Federal Rule of Appellate Procedure 35(a) and Circuit Rule 35-3. The three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit.

Judges Kozinski and McKeown did not participate in the deliberations or vote in this case.

*Feldman v. Arizona*, No. 16-16698

O'SCANNLAIN, Circuit Judge, with whom TALLMAN, CALLAHAN, BEA, and IKUTA, Circuit Judges, join, dissenting from the grant of rehearing en banc:

We have made a serious mistake by granting rehearing en banc. Our court risks present chaos and future confusion in pursuit of an outcome the Supreme Court has explicitly told us to avoid. There are no good reasons—and many bad ones—to take this case en banc six days before the election on such a compressed schedule. Sadly, a majority of this court has ignored such dangers in its unseemly rush to overrule, by any means necessary, a five-day old opinion. One hopes cooler heads prevail and this case receives the attention it deserves—but I fear instead a shoot-first, ask questions later approach that will haunt us for years to come.

I

A brief background: On September 23, 2016, the district court denied plaintiffs' motion for a preliminary injunction blocking Arizona from implementing certain provisions in Arizona House Bill 2023. These provisions restrict the collection of voters' early ballots to family members, household members, certain government officials, and caregivers. Plaintiffs appealed. A Ninth Circuit motions panel unanimously denied plaintiffs' emergency motion for an injunction pending appeal on October 11th. On October 14th that same panel

*sua sponte* amended its October 11th ruling to expedite the appeal. In fourteen days a merits panel received briefing, heard oral argument, and issued an opinion affirming the district court and denying the request for a preliminary injunction by a two to one majority. The case was called en banc the same day the opinion was issued (October 28th). Eschewing our normal en banc schedule, memo exchange and voting took place over five days.

Why the rush?

## II

### A

The closer we are to election day the more a preliminary injunction is disfavored. *See*, *e.g.*, *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (staying a district court's injunction "given the imminent nature of the election").[1] Early voting began in Arizona on October 12th. Upsetting the applecart 90% of the way through voting by issuing an injunction a couple of days before November 8th

---

[1] Other circuits have repeatedly recognized that this kind of meddling right before an election is almost never appropriate. *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (staying an injunction "in light of the importance of maintaining the status quo on the eve of an election"); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 139 n.9 (1st Cir. 2012) (noting that "even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own"); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored.").

would fly in the face of Supreme Court guidance counseling against this exact type of last-minute interference. *Purcell v. Gonzalez*, 549 U.S. 1, 4–6 (2006) (vacating a Ninth Circuit injunction against the State of Arizona because of "the imminence of the election and the inadequate time to resolve the factual disputes").[2] We should follow other circuits and respect *Purcell*. *See, e.g.*, Crookston *v. Johnson*, No. 16-2490, 2016 WL 6311623 (6th Cir. Oct. 28, 2016) ("Call it what you will — laches, the *Purcell* principle, or common sense — the idea is that courts will not disrupt imminent elections absent a powerful reason . . . .").

B

A second serious problem is that we risk creating a mess of current law by trying to produce a ruling under self-imposed time pressure. The en banc court could render a decision in the next five days in hopes of enjoining Arizona's law

---

[2] The majority may argue that the importance of ensuring everyone has the right to vote trumps any concern about jumping the gun or improperly interfering in an election. But, *Purcell* addressed this exact question, and the Supreme Court decided 9-0 against the position the majority espouses. Indeed, the law at issue in that case, identification requirements, affected far more people and potentially took away their right to vote entirely, whereas this law affects fewer voters and only restricts one aspect of one way of early voting. *Id.* at 2–3; *see also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 187–88 (2008) (discussing potential reach of ID law). We cannot overturn Supreme Court precedent, even if some judges wish it were otherwise. *See, e.g., Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009), *rev'd, Harrington v. Richter*, 562 U.S. 86 (2011) ("[J]udicial disregard [for sound and established principles] is inherent in the opinion of the Court of Appeals for the Ninth Circuit here under review.").

before election day and then deal with the consequences of its decision later. Or, it could take whatever time it deems necessary to gain a thorough mastery of the record, to hear oral argument from the parties, and to write a considered opinion in plenty of time for the next election. This case has an extensive record and could potentially set an important precedent.

"Allowing the election to proceed without enjoining the statutory provisions at issue will provide the courts with a better record on which to judge their constitutionality. . . . Given the importance of the constitutional issues, the Court wisely takes action that will enhance the likelihood that they will be resolved correctly on the basis of historical facts rather than speculation." *Purcell*, 549 U.S. at 6 (J. Stevens, concurring).

We should heed Justice Stevens's advice.

III

I respectfully dissent from the ill-advised order granting rehearing en banc under these contrived conditions.

4

*Feldman v. Arizona*, No. 16-16698

REINHARDT, Circuit Judge, concurring in the grant of rehearing en banc


This is an urgent case of extraordinary importance involving the suppression of minority voters on the eve of a presidential election.

"Arizona has criminalized one of the most popular and effective methods by which minority voters cast their ballots." Thomas Dissent at 1. The law at issue makes it a felony for most people to accept a ballot that a voter has filled out and deliver it to the appropriate polling place on the voter's behalf. It punishes the routine actions of many get-out-the-vote organizations and political campaigns. Violators can be sentenced to a year in jail and a $150,000 fine. Despite the panel majority's opinion to the contrary, the record in this case fully documents the disparate burden that this law imposes on minority voters. "There are many burdens and challenges faced in Arizona by Native Americans, Hispanics, African-Americans, the poor, and the infirm who do not have caregivers or family. With H.B. 2023, Arizona has added another: disenfranchisement." Thomas Dissent at 29. It is just as clear that the state's justifications for the law do not withstand any level of scrutiny.

1

It is indeed no secret that many states have recently enacted legislation making it more difficult for members of minority groups to vote in presidential elections. Arizona is one. It has done so under the guise of guarding against voter fraud, although not one single case of voter fraud in the history of Arizona elections was identified by the Arizona legislature when it enacted statutes changing its system to attempt to limit the opportunity to vote of members of minority groups -- of Hispanics, African Americans, and Native Americans -- as well as the poor and infirm. And not one case of voter fraud has been cited to the district court or this court by Arizona when seeking to defend its indefensible and race-based statute.

In the wake of the panel majority's opinion upholding the invidious Arizona statute by a 2-1 vote, the judges on this court voted to take the case en banc. I am confident that a majority of the members of the court do not support the panel majority's view that the pretextual risk of voter fraud outweighs the significant burdens on the right to vote imposed by this unconscionable law. I am confident, instead, that the majority of the members of the court agree with Chief Judge Thomas's persuasive opinion that "the anti-ballot-collection law significantly burdens the voting rights of minorities, particularly Hispanic and Native American voters" and that "[t]he State's justification of preventing voter fraud was not, and is not, supportable." Thomas Dissent at 29.

2

\*\*\*

Different members of the court embrace differing legal philosophies and historical understandings regarding the significance of the Voting Rights Act and the Constitution with relation to election restrictions and their discriminatory effects. A decision on an issue of such profound legal and political importance that could affect not only the rights of Arizona citizens but the interests of all Americans in the outcome of a presidential election should not depend on a 2-1 vote of three members of a panel of our court. Rather, our en banc process affords a more representative sampling of this court's group of judges in helping to decide what fundamental approach to voting rights this Circuit will adopt. An en banc court of eleven is ordinarily far more likely than a panel of three to express the view of the court as a whole.

Unfortunately, however, our en banc process is not perfect and also does not necessarily represent the view of the full court. It is selected by lot, as a full court en banc is ordinarily deemed too unwieldy. Thus, although it is preferable to a three judge panel, in an extraordinary case such as this, it too may not accurately reflect the view of the court as a whole. It is possible that we will be faced with such a case here. The en banc court here is composed of a majority of judges who did not support the en banc call. Although I would hesitate to predict the outcome of the en banc court's deliberation, it may be that its judgment will not reflect the

3

view of the full court. Nevertheless, although the en banc court is weighted by chance in favor of those who failed to support en banc rehearing, it still has a better chance of representing the view of the court as a whole than does any panel of three. If the en banc court does not reach the conclusion that I believe the full court would have reached, at the least it reflects a proper use of our en banc system. In my own view, regardless of the decision of the en banc court, I am confident that the court as a whole would have rejected the panel majority's conclusion and enjoined the enforcement of the Arizona statute, although we will probably never know if I am correct. Whether I am or not, I should emphasize that whatever decision the en banc court reaches will be legitimate and will properly be binding on our court and in our Circuit.

***

Judge O'Scannlain, whose view regarding convening an en banc court was rejected by the full court in the only vote in this case the full court is likely to take, asks, "Why the rush?" O'Scannlain Dissent at 2. Here is one answer: a presidential election is just one week away, and the franchise of a potentially decisive number of voters depends upon our decision. If we conclude that we ought to do nothing while we still can because acting now might affect the very election that the challenged statute was enacted to distort, we would not only permit Arizona to frustrate the purposes of the Voting Rights Act and the

4

Constitution, but also encourage other state legislatures to pass laws carefully timed to be effectively unreviewable in court and carefully designed to influence the outcome of specific elections.

It is particularly ironic that Judge O'Scannlain cites *Purcell v. Gonzales*, 549 U.S. 1 (2006), in support of his argument that the court should sit resolutely aside as discriminatory voter suppression goes unredressed. In *Purcell*, the Supreme Court stayed an injunction of a different Arizona law affecting the 2006 mid-term election in part because "Arizona [was] a covered jurisdiction under § 5 of the Voting Rights Act of 1965." *Id*. at 2. The state was, as a result, "required to preclear any new voting 'standard, practice, or procedure' with either the United States Attorney General or the District Court for the District of Columbia to ensure its new voting policy did 'not have the purpose [or] effect of denying or abridging the right to vote on account of race or color.'" *Id*. Arizona had obtained that pre-clearance for which Congress had provided. *Id*. at 3.

After the Supreme Court's 2013 decision in *Shelby County v. Holder*, however, which effectively invalidated the preclearance provision of § 5, 133 S. Ct. 2612, the courts provide the only meaningful check on voter suppression and on discrimination in the exercise of the most fundamental civic right in our democracy. The extraordinary circumstances of this case thus make it all the more necessary for us to uphold what remains of the Voting Rights Act and enforce the

constitutional rights of all citizens – including the members of minority groups that the majority of the Arizona state legislature might prefer not to hear from in this election.

Notwithstanding Judge O'Scannlain's arguments as to what the Supreme Court would do, we have a duty to enforce the law and our constitution as we see it. Equally important, despite a similar injunction issued by the Fourth Circuit, the Supreme Court has not intervened to stay any action taken by a circuit court in advance of the 2016 presidential election, but has left such disputes for the circuit courts to resolve. Moreover, this Arizona criminal statute, which applies to third parties and carries a serious jail sentence, is far different from those which the Supreme Court has declined to enjoin in previous election cycles. To calm Judge O'Scannlain's fears, however, I would note that the Supreme Court is quite capable of timely staying any injunction that our court may issue if it disagrees with us.

***

I concur in the well-advised order granting rehearing en banc. Even should the en banc court not reach the result I am convinced the majority of the full court would have reached, we will have followed the best process that is available to us in our attempt to do so. We will also have exposed, although in dissent, the inequity and essential vice of the Arizona statute. Should, however, the en banc

6

court adopt the view I believe to be held by the court as a whole, we will have accomplished far more.  We will have vindicated the right of all voters to fair and just treatment under the United States Constitution and Section 2 of the Voting Rights Act.